

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RTP:PP
F. #2019R00143

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 18, 2020

By ECF

The Honorable Allyne R. Ross
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Cornalious Cooper
     Criminal Docket No. 19-159 (ARR)

Dear Judge Ross:

   The government respectfully submits this letter in advance of the defendant Cornalious Cooper's sentencing hearing. On October 29, 2019, a jury convicted the defendant of assault of a federal officer, a misdemeanor offense punishable by up to one year' imprisonment. For the reasons set forth below, the government respectfully submits that a sentence of one year' imprisonment, which is below the advisory United States Sentencing Guidelines ("Guidelines") range of 18 to 24 months' imprisonment, is appropriate in this case.

I.  Background

   On January 22, 2019, U.S. Park Police ("USPP") Officer Robert O'Brien was patrolling the Gateway National Recreation Area in a marked USPP vehicle. The vehicle had "overhead lights," as well as "markings on the side, decals" and other indicators of being a law enforcement vehicle. (Trial Transcript ("Tr.") at 28.) Officer O'Brien was wearing a uniform. (Tr. at 29.) At approximately 11:45 p.m., Officer O'Brien completed patrolling the park and began traveling to another federal park. While in transit on the Belt Parkway, the officer observed the defendant's vehicle driving erratically at a high speed. Officer O'Brien observed the "vehicle weaving in and out of traffic," coming "close to striking vehicles several times." (Tr. at 32.) Other vehicles had to use "their brakes to avoid a collision," because of the defendant's driving. (<u>Id.</u>) After the defendant began to accelerate to speeds that exceeded 90 miles per hour, Officer O'Brien began following the vehicle. (Tr. at 33.) The defendant then,

from the left lane of the three-lane highway, crossed over the center and right lanes and exited the Belt Parkway.  (Tr. at 32-33.)

After the defendant exited the Belt Parkway, his vehicle became stationary behind another vehicle, which was stopped for a red light.  Officer O'Brien then pulled his vehicle directly next to the defendant's vehicle to "box him in."  (Tr. at 33.)  Officer O'Brien activated his emergency lights and "hit the air horn several times to get his attention."  (Id.)  Officer O'Brien, with his window lowered, made eye contact with the defendant and "yelled" for him to turn off his engine and show his hands.  (Tr. at 35.)  The defendant revved his engine and pressed his horn several times.  He then attempted to maneuver his vehicle to get around the car that was in front of him.  (Tr. at 36.)  Officer O'Brien left his vehicle, stood directly in front of the defendant's vehicle, and again directed the defendant to put his hands up and turn his car off.   (Tr. at 37.)  The defendant "continuously revv[ed] his vehicle," and then "lurched again," striking Officer O'Brien in the legs just below the knees.  (Tr. at 37-38.)  Officer O'Brien then drew his firearm and placed his hand on the hood of the defendant's vehicle.  (Tr. at 38.)  He again "yell[ed] at the driver to turn the car off, put [his] hands up."  (Tr. at 39.)  He repeated this "at least" six times.  (Id.)  At this point, the traffic light had turned green, the car that had been in front of the  defendant's vehicle had started to pull away, and the defendant then proceeded to accelerate his vehicle.  Officer O'Brien quickly moved out of the way to avoid being run over, but the defendant's vehicle "swiped" Officer O'Brien on his side and a "tire ran over the top of [his] right foot."  (Tr. at 40.)  After the defendant fled, Officer O'Brien attempted to follow the defendant but he was unable to catch up to the vehicle due to the speed the defendant was driving.  (Tr. at 42-43.)  Officer O'Brien fortunately did not sustain any injuries as a result of the defendant's conduct.  (Tr. at 41.)[1]

In his victim impact statement to the Court, Officer O'Brien writes about the fear he felt that evening: that he could "lose [his] life at that very moment," and about how "close [he] came to taking another's life that night."  Corroborating this statement is Officer O'Brien's trial testimony about how rarely he draws his firearm:  in his 23-year career, Officer O'Brien has only drawn his gun on an individual three times, and he has never fired his weapon.  Despite making countless traffic stops in his career, this was the only time Officer O'Brien has drawn his gun during a traffic stop.  (Tr. at 90-91.)  Officer O'Brien is an experienced and prudent federal officer and the fact that he drew his gun and responded in this manner demonstrates how much of a threat he viewed the defendant's conduct.

On February 7, 2019, USPP agents arrested the defendant for the assault on Officer O'Brien.  The defendant waived his Miranda rights and agreed to speak to the agents.  The defendant said that he was driving fast on the Belt Parkway that night because he had his

---

[1] Officer O'Brien's testimony was consistent with the "radio runs" he made beginning approximately one minute after being hit, some of which were admitted at trial.  For example, Officer O'Brien reported to his dispatcher that the "subject struck me in the right leg."

vehicle stolen in the past and he feared another vehicle was chasing him. (Tr. at 100.) He stated that he did not initially know the officer was trying to stop him (indicating that he knew Officer O'Brien was law enforcement and he did realize during the stop that Officer O'Brien was pulling him over). (Tr. at 101.) Agent Manuel Fajardo of the USPP then asked the defendant to write a statement to "tell [his] version of what happened." (Tr. at 103.) The defendant wrote:

> I was driving home I take the belt parkway to exit at erskin but while I was driving a red car was tailing me a few times he got real close my car had gotten stolen befor in the past I got scared and ran from him. I had took an Exit and an officer pulled on the side of me. At first I didn't know he was pulling me over intill A drew his gun he hit my hood and told me to get out I was aready scared from running from the first red car wen I saw the gun I just ran when I finally got home in my mind I was telling my self I wasn't not thinking right I am sorry for everything.

(GX 8.)

At trial, the defendant testified in his own defense. During that testimony, the defendant testified contrary to Officer O'Brien's testimony and the defendant's own post-arrest statement. The defendant stated that he was speeding to avoid a red car that was following him, and that he then exited the Belt Parkway to avoid that vehicle. (Tr. at 126-127.) The defendant testified that a "SUV" pulled up by his "left rear tire," and that he did not see any flashing lights or hear a siren. (Tr. at 130.) According to the defendant, he next saw a "guy with a gun," "wearing all black" by his passenger window. (Tr. at 130.) The defendant stated the individual with the firearm "was aiming the gun directly at me," and then "walked to [his] hood" and hit his car three times while aiming the gun at the defendant. (Tr. at 130.) The defendant heard the individual tell him to "shut off the car." (Tr. at 131.) The defendant testified that he then drove off. The defendant stated that, after he got home, he thought "a random guy pulled out a gun on me." (Tr. at 132.)

The defendant testified on direct examination that he was "shocked" when he learned why he was arrested. (Tr. at 134.) He also stated that he did not run over anyone that night and that he did not bump anyone that night with his vehicle. (Tr. at 135 & 142.) The defendant stated that he wrote his post-arrest statement – the statement where he admitted to knowing Officer O'Brien was a police officer – only because the agents told him "if you write this it will help you out, you can show it to people and it will get [you] out of the situation." (Tr. at 134.) However, Agent Fajardo testified that he did not make any promises to the defendant and that he simply told him that putting the version of his events in his own words would be better than how the evidence portrayed the events. (Tr. at 155.) And, as discussed above, the defendant admitted in his statement that a) he knew an officer was "pulling [him] over" prior to him fleeing the scene; and b) that he saw the officer prior to the officer drawing his firearm. Both of these statements contradict his trial testimony. The

3

defendant's testimony that he did not see the police lights or hear the police horn also defies credibility.

The jury acquitted the defendant of assault on a federal officer with a dangerous weapon or by making physical contact, but convicted the defendant of misdemeanor assault.

II.    Sentencing Guidelines

A.    The Guidelines Calculation

The government submits that the following Guidelines calculation should be applied, which is different from both the Guidelines calculation in the PSR and the defendant's calculation.

| | |
|---|---:|
| Base Offense Level (§ 2A2.4(a)) | 10 |
| Plus:  Physical Contact or Dangerous Weapon Possessed and Use Threatened (§ 2A2.4(b)(1)) | +3 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Total: | <u>15</u> |

Based on a Criminal History Category of I, a total offense level of 15 carries a Guidelines range of 18 to 24 months in custody.

B.    The Defendant's Objections

The defendant objects to this Guidelines calculation.[2]  First, the defendant objects to the three point enhancement for physical contact or a dangerous weapon being possessed and its use threatened because the jury acquitted the defendant of assault involving physical contact.  As an initial matter, the court may consider acquitted conduct in determining an appropriate sentence.  See United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that "district courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct" so long as the court "consider[s] the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence" (internal citations omitted)).  Officer O'Brien credibly testified that the defendant struck him with the

_____

[2] The defendant also objects to the six point victim-related enhancement under § 3A1.2(c)(1) for the victim being a law enforcement officer.  The government agrees with the defendant that this enhancement should not be applied pursuant to Application Note §2A2.4 Note 2.  The Probation Department has advised the government that it will be submitting a PSR Addendum that removes this enhancement from the Guidelines calculation.

vehicle on two occasions.  The defendant's testimony to the contrary lacked credibility due to both the discrepancies between his testimony and his post-arrest statement, and due to portions of his testimony being inherently unbelievable.[3]   Further, the court should also apply this enhancement because the defendant possessed a dangerous weapon (a vehicle) and threatened its use during the assault of Officer O'Brien.  Thus, this three point enhancement applies.

Second, the defendant objects to the two-point enhancement for obstruction of justice.  Contrary to the defendant's submission, this enhancement is appropriate not because the defendant exercised his constitutional right to testify in his own defense but because he lied under oath.  The defendant made numerous false statements under oath, including: a) he did not know Officer O'Brien was a police officer until his arrest (and that he thought a "random" guy" pointed a gun at him; b) he did not hear the police sirens or horn; c) he did not strike Officer O'Brien; and d) the USPP agents who arrested him told him what occurred and then pressured him into writing his post-arrest statement.  The credible testimony of Officer O'Brien and Agent Fajardo, as well as the entire evidentiary record, supports by at least a preponderance of the evidence that the defendant lied under oath.[4]

III.     A Sentence of One Year' Imprisonment is Appropriate

The government respectfully submits that a sentence of one year' imprisonment, the maximum available sentence but below the applicable Guidelines' range, is sufficient but not greater than necessary to comply with the objectives set forth in Section 3553(a).  First, the "nature and circumstances of the offense," assaulting a federal officer with a vehicle and fleeing the scene, is unquestionably serious and violent.  The defendant first placed fellow motorists in danger by weaving in and out of lanes at an extremely high speed on a New York City highway, causing cars to brake to avoid a collision.  In response to Officer O'Brien trying to effectuate a traffic stop in response to this dangerous driving, the defendant did not comply with law enforcement commands.  Instead, after Officer O'Brien exited his vehicle, the defendant bumped Officer O'Brien with his car.  After Officer O'Brien drew his firearm, the defendant revved his engine and took off.  Officer O'Brien spun out of the way, but the defendant struck the officer and ran over his foot.  Fortunately, Officer O'Brien was not hurt.  But the defendant's violent conduct could have caused serious injuries to Officer O'Brien had the officer not reacted as quickly as he did.  The fact that

---

[3] For example, the defendant testified that he did not hear the police sirens or horn that Officer O'Brien used, even though Officer O'Brien pulled directly alongside the defendant's driver side window and blared his horn multiple times.

[4] The defense submits that the obstruction enhancement should also not be applied because it is irrelevant whether the defendant knew Officer O'Brien was a federal officer. The defendant's false statement was not that he did not know the individual was a federal officer, but that he did not know it was a law enforcement officer (regardless of federal, state or local) pointing a firearm at him and ordering him to turn off his car.

Officer O'Brien was not hurt should not mitigate the seriousness of the defendant's assault. As Officer O'Brien writes to the Court, the defendant "could have chosen to stop his vehicle and . . . listen to my commands.  He could have chosen to not try to drive through me to escape the traffic stop.  His choices led to the danger and risk to human life that night."

A custodial sentence is also necessary to "promote respect for the law."  18 U.S.C. § 3553(a)(2)(A).  By committing perjury at trial, the defendant has shown utter disrespect for the law and the fair administration of justice.  The defendant also showed disrespect for the law by, when pulled over by a law enforcement officer for a traffic stop, disobeying commands, using his vehicle as a weapon, and fleeing the scene.  A sentence of one year' imprisonment is also necessary to not only deter the defendant from such conduct in the future, but also to provide general deterrence so that other individuals understand the serious consequences if they choose to assault a federal law enforcement officer instead of complying with lawful police commands.

The government acknowledges the defendant's family circumstances, that the defendant has no criminal history and that the defendant has held stable employment and not committed another criminal offense since his February 2019 arrest.  But these factors do not warrant a non-custodial sentence given the defendant's serious conduct and his perjury at trial.  Thus, based on the circumstances of this case, a sentence of one year' imprisonment, which is below the applicable Guidelines range, is sufficient but not greater than necessary to achieve the goals of sentencing.

IV.   Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of one year' imprisonment.

Respectfully submitted,

SETH D. DᴜCHARME
Acting United States Attorney

By:   /s/ Philip Pilmar
Philip Pilmar
Assistant U.S. Attorney
(718) 254-6106

cc:   Clerk of Court (ARR) (By ECF)
Ashley Burrell, Esq. (By ECF)

6